JUDGE PHILIP MARTINEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

2010 DEC -1 PM 2: 52

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK, FRANKFURT
AM MAIN, NEW YORK BRANCH,

          Plaintiff,

        v.

JANICE SOTO,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case No.

Claim: $279,136.29

Breach of Contract

EP 10 CV 0447

## COMPLAINT

NOW COMES DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK,

FRANKFURT AM MAIN, NEW YORK BRANCH, ("DZ Bank"), by and through its attorneys

and for its Complaint against JANICE SOTO, ("Soto"), states as follows:

### PARTIES

1.     DZ Bank is a bank registered under the laws of the Federal Republic of

Germany that maintains a place of business in the United States at 609 5th Avenue, New

York, New York, 10017.

2.     Soto is a Texas resident residing at 5815 Timberwolf Drive, C1, E1 Paso,

Texas, 79903.

### JURISDICTION AND VENUE

3.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §1332(a)(2).

The parties are citizens of a state and citizens or subjects of a foreign state and the amount

in controversy exceeds $75,000.00 exclusive of interest and cost.

4.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(a) because a

substantial part of the events or omissions giving rise to DZ Bank's claim occurred in this

district and because the Defendants are subject to personal jurisdiction in this district.

## BACKGROUND

5.      On November 30, 2008, Brooke Credit Corporation (now known as Aleritas Capital Corporation) ("BCC") and Soto executed a Promissory Note, Loan No. 6653 in which BCC agreed to loan Soto $277,499.25 plus interest at the rate of 3.5% above the Prime Rate as published in *The Wall Street Journal,* adjusted daily (i.e., the day after each change of the published Prime Rate). A true and correct copy of the Loan as well as an Agreement for Advancement of Loan (collectively, the "Loan") is attached hereto as Exhibit 1.

6.      BCC assigned the Loan to Brooke Credit Funding, LLC ("BCF") and BCF pledged the Loan to its lenders as security.

7.      BCF's senior secured creditors are DZ Bank and Autobahn Funding Company, LLC ("Autobahn"). By written agreement, Autobahn appointed DZ Bank as its agent, authorizing DZ Bank to enforce its rights under the Loan in DZ Bank's name.

8.      BCF defaulted on its obligations to DZ Bank.

9.      On October 30, 2008, DZ Bank, BCC, and BCF entered into a Surrender of Collateral, Consent to Strict Foreclosure, Release and Acknowledgment Agreement (the "Surrender of Collateral"). A true and correct copy of the Surrender of Collateral is attached hereto as Exhibit 2. The Loan is included in the Surrender of Collateral.

10.      Under Section 1.3.1 of the Surrender of Collateral and other provisions thereof, DZ Bank has full ownership of the Loan.

11.      On October 31, 2008, DZ Bank and BCF entered into an Omnibus Assignment Agreement whereby BCC further confirmed that DZ Bank has full ownership of BCF's rights as BCC's assignee under the Loan. A true and correct copy of the Omnibus Assignment Agreement is attached hereto as Exhibit 3.

12.      Soto defaulted under the Loan by failing to make payments when due.

13.    DZ Bank demanded payment from Soto for the outstanding balance of $279,136.29 but Soto has failed and refused to pay the same.

14.    Pursuant to the Loan, DZ Bank is entitled to attorneys' fees, costs and interest.

15. The Loan is governed by the laws of the State of Kansas.

**COUNT I**
**BREACH OF CONTRACT AGAINST**
**JANICE SOTO**

16.    DZ Bank realleges and reasserts Paragraphs 1 through 15 of its Complaint as though fully set forth in Paragraph 16 of its Complaint.

17.    Due to Soto's default under the Loan, DZ Bank has been damaged in the amount of $279,136.29, plus attorneys' fees, costs and interest.

WHEREFORE DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK FRANKFURT AM MAIN, NEW YORK BRANCH prays that judgment be entered against JANICE SOTO in the amount of $279,136.29, plus attorneys' fees, costs and interest, as well as all other relief which this Court deems just.

Respectfully submitted,

**FIRTH ♦ JOHNSTON ♦ MARTINEZ**
415 N. Mesa St., Third Floor
El Paso, Texas  79901
Phone:  (915) 532-7500
Facsimile:  (915) 544-0469


By: _____
**ANTONIO MARTINEZ, JR.**
Texas Bar No. 13139100
Attorney for Plaintiff

| | | |
|---|---|---|
| Janice Soto<br>4312 Montana<br>El Paso, TX 79903 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS 66210 | Loan Number 8653<br>Date 11-30-2007<br>Maturity Date 11-15-2022<br>Loan Amount $ 277,499.25<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of **two hundred seventy seven thousand four hundred ninety nine and 25/100** _____ Dollars $ 277,499.25

☒ **Single Advance:** I will receive all of this principal sum on 11-30-2007 _____ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____ I will receive the amount of $ _____ and future principal advances are contemplated.

    Conditions: The conditions for future advances are _____

    ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to all other conditions and expires on _____

    ☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 11-30-2007 _____ at the rate of _____ 11.000 % per year until 12-01-2007 _____ .

☒ **Variable Rate:** This rate may then change as stated below.

    ☒ **Index Rate:** The future rate will be 3.500 percent above _____ the following index rate: Prime Rate, as published in The Wall Street Journal

    _____

    ☐ **Ceiling Rate:** The interest rate ceiling for this note is the _____ ceiling rate announced by the Credit Commissioner from time to time.

    ☒ **Frequency and Timing:** The rate on this note may change as often as every day beginning 12-01-2007 _____

    A change in the interest rate will take effect On the following day _____

    ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than _____ %. The rate may not change more than _____ % each _____

    Effect of Variable Rate: A change in the interest rate will have the following effect on the payments:

    ☒ The amount of each scheduled payment will change.    ☐ The amount of the final payment will change.

    ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a Actual/365 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:

    ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).

    ☐ at a rate equal to _____

☐ **LATE CHARGE:** If a payment is made more than _____ days after it is due, I agree to pay a late charge of _____

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount above: _____

**PAYMENTS:** I agree to pay this note as follows:

180 monthly payments of $3,141.06 beginning 12-15-2007. This is a variable rate loan and the payment amounts may change.

**ADDITIONAL TERMS:**

1) See Agreement for Advancement of Loan dated November 30, 2007.

2) The term following day referred to in "Frequency and Timing" above refers to the next business day following a change in the Prime Rate as reported in the Wall Street Journal.

3) As referenced in "Effects of Variable Rate" above, the payments will change on the 15th day of calendar month following the month during which the rate changed.

4) A prepayment premium of 3.5% of any amount prepaid in excess of the scheduled principal payment will be assessed for the first sixty (60) months of the first payment.

> THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.
>
> THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date):

Security Agreement dated November 30, 2007.

(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is Purchase Insurance Agency Assets and Franchise

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE INCLUDING THOSE ON PAGE 2).** I have received a copy on today's date.

Janice Soto *Janice Soto*

*Janice Soto*
Janice Soto, Individually

Signature for Lender

*Anna Beth Maintzer*
Anna Beth Maintzer, Loan Officer

**EXHIBIT**

1

| Junica Soto<br>4312 Montana<br>El Paso, TX  79903 | Brooke Credit Corporation<br>10950 Grandview Dr., Ste. #600<br>Overland Park, KS  66210 | Loan Number 6853<br>Date 11-30-2007<br>Mat. Date 11-15-2022<br>Loan Amount $ 277,499.25<br>Renewal Of |
|---|---|---|
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

## DISBURSEMENT AUTHORIZATION

I hereby authorize and request the following disbursement from the loan referenced above:

| | | | |
|---|---|---|---|
| a. Amount given to me directly | $ 0.00 | o. | $ |
| b. Amount paid on my account (# _____ ) | $ | p. | $ |
| c. To Lender | $ | q. | $ |
| Amounts paid to others on my behalf: | | r. | $ |
| d. Insurance Companies | $ | s. | $ |
| e. Public Officials | $ | t. | $ |
| f. Loan Fee - BCC GL #4425 | $ 8,324.98 | u. | $ |
| g. BFC-Agency/Franchise Purchase | $ 222,000.00 | v. | $ |
| h. BFC-Franchise Fee | $ 47,174.27 | w. | $ |
| i. | $ | x. | $ |
| j. | $ | y. | $ |
| k. | $ | z. | $ |
| l. | $ | aa. | $ |
| m. | $ | bb. | $ |
| n. | $ | cc. | $ |

Comments:

Janice Soto

X _Janice Soto_

Janice Soto, Individually

X _____

X _____

Loan Officer: Anna Beth Marintzer   _Anna Beth Marintzer_

X _____

X _____

X _____

Experts   © 1985 Bankers Systems, Inc., St. Cloud, MN  Form DA  8/30/2000

(page 1 of 1)

## Amendment to
## Agreement for Advancement of Loan

This Amendment is made to and a part of the Agreement for Advancement of Loan dated November 30, 2007, (the "Agreement") by and between Brooke Credit Corporation ("Lender") and Janice Soto ("Borrower").

WHEREAS, Borrower has executed the Agreement and certain related "Loan Documents," as such is defined in the Agreement.

WHEREAS, Borrower and Lender wish to amend the closing date of the Agreement and certain related Loan Documents dated November 30, 2007.

WHEREAS, Borrower and Lender wish to amend the first payment date on the Agreement and certain related Loan Documents dated November 30, 2007.

WHEREAS, Borrower and Lender wish to amend the payment language on the Agreement and certain related Loan Documents dated November 30, 2007.

NOW, THEREFORE, in consideration of the terms and conditions set forth herein and of any loans or advances now or hereafter made to or for the benefit of Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower agree as follows:

1. The Agreement and Loan Documents dated November 30, 2007 are hereby amended to be dated December 12, 2007.

2. The first payment date listed on the Agreement and Loan Documents dated November 30, 2007 is hereby amended to be January 15, 2008.

3. The payment language on the Agreement and Loan Documents is hereby amended to read:

   "*180 monthly payments of $3,158.44 beginning 01-15-2008.  This is a variable rate loan and the payment amounts may change.*"

4. Borrower further agrees that this Amendment may be affixed to each and every Loan Document as evidence of the Amendment thereof in accordance with the above terms.

Unless specifically amended herby, all provisions, terms and conditions shall remain as set forth in the Agreement and Loan Documents.

© Brooke Credit Corporation all rights reserved

THIS AMENDMENT is executed on this ___1+L___ day of December, 2007.

BROOKE CREDIT CORPORATION          JANICE SOTO

By _Anna Beth Marintzer_           By _Janie Soto_
  Anna Beth Marintzer                  Janice Soto, Individiually
Its: Loan Officer

© Brooke Credit Corporation all rights reserved

## EXHIBIT P

## AGREEMENT FOR ADVANCEMENT OF LOAN

THIS AGREEMENT FOR ADVANCEMENT OF LOAN (the "Agreement") is made and entered into as of the 30th day of November, 2007, by and between Brooke Credit Corporation ("Lender") and Janice Soto, Individually ("Borrower").

### RECITALS

WHEREAS, Lender has agreed to loan to Borrower the amount of $277,499.25 for the purpose of acquiring insurance agency assets and franchise; and

WHEREAS, this Agreement and the Loan Documents, as defined herein shall apply to all existing and future loans or advances made by Lender to Borrower.

NOW, THEREFORE, in consideration of the terms and conditions set forth herein and of any loans or advances now or hereafter made to or for the benefit of Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower agree as follows:

### DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings unless the context clearly requires otherwise:

**Agency's Assets.** All of Borrower's personal property, whether tangible or intangible, and all of Borrower's interest in property and fixtures, now owned or existing or hereafter acquired and wherever located, including without limitation, the following: (a) all inventory, machinery, equipment, goods and supplies; (b) all accounts, including without limitation, the Agent's Account and Customer Accounts; (c) all instruments, documents (including, without limitation, the Customer Files) policies and certificates of insurance, money, chattel paper, investment property, deposits, warehouse receipts and things in action; (d) all general intangibles and rights to payment or proceeds of any kind, including without limitation, rights to insurance proceeds and letter of credit proceeds; (e) all contract rights and interests of any kind, including without limitation, the rights and interests set forth in the Agent Agreement and any Subagent Agreement; and (f) any and all additions, attachments, parts, repairs, accessories, accessions, replacements and substitutions to or for any of the forgoing. The above description of property shall also include, but not be limited to, any and all telephone numbers, rights to the lease of office space, post office boxes or other mailing addresses, rights to trademarks and use of trade names, rights to software licenses, and rents received by Borrower for the lease of office space. Proceeds and products of the above property are also covered.

**Agent Account.** An account on Master Agent's ledgers to which the Master Agent records amounts due Master Agent from Borrower and amounts due Borrower from Master Agent.

**Agent Agreement.** Agreement which has been or will be executed by and between Borrower and Master Agent providing for Borrower to sell, renew, service or deliver Policies exclusively through Master Agent which has been or will be signed by Borrower and Master Agent.

**Agent of Record.** Person designated on Company's records as the agent or representative regarding a specific Policy and the owner of all Sales Commissions.

**Closing Date.** The date upon which the Lender extends credit to Borrower.

**Collateral Preservation Agreement.** Agreement, as amended from time to time, between the Master Agent and Lender which requires the Master Agent to help protect and preserve Lender's collateral interest in certain Agency Assets including, without limitation, Agent's Account and Customer Files.

C. 2007 Brooke Credit Corporation all rights reserved

**Company.** A company issuing, brokering, selling or making a market for Policies and which has a contract with Master Agent.

**Customer Accounts.** A Person who has a Policy purchased from, serviced, renewed or delivered through Borrower. Customer Accounts may be owned by Borrower or a Subagent of Borrower.

**Customer Files.** Documents, data and correspondence to or from Customer Accounts, Borrower, Master Agent, Companies, or others regarding Policies.

**Insurance, Investment, Banking and/or Credit Services.** Insurance services include but are not limited to the sale, renewal, service or delivery of insurance policies, annuities, insurance brokering services, insurance customer services, risk management services and insurance related consulting or advisory services. Investment services include, but are not limited to, the sale, renewal, service or delivery of mutual funds, stocks, bonds, notes, debentures, real estate services, investment customer services, investment related consulting, and financial, investment, or economic advisory services. Banking services include any banking service Borrower is allowed to perform under federal and/or state laws. Credit services include, but are not limited to, origination or brokerage of loans or mortgages, credit customer services, and credit related consulting or advisory services. At any point in time, Insurance, Investment, Banking and Credit Services shall be limited to those services then offered by Master Agent.

**Lender.** The Lender named above, its successors, assigns or designees.

**Loan Documents.** This Agreement and all other agreements, instruments and documents, including without limitation, any guaranties, mortgages, deeds of trust, notes, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, subordination agreements, financing statements and all other written documents heretofore, now and/or from time to time hereafter executed by and/or on behalf of Borrower and delivered to Lender in connection therewith, including, without limitation, the documents referenced in paragraphs 1 through 11 herein.

**Master Agent.** The party with whom Borrower enters an Agent Agreement. Pursuant to the Agent Agreement, Master Agent is made the "agent of record" for all Policies sold, renewed, serviced or delivered through Borrower. Master Agent is Borrower's primary contact with Companies and other suppliers.

**Person.** Any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution or other entity.

**Policies.** Any and all insurance services, policies, coverages or products sold, renewed, serviced or delivered through Borrower to any Person. Policies include, but are not limited to, any and all Insurance, Investment, Banking or Credit Service, or policy, coverage or product associated therewith sold, renewed, serviced or delivered through Borrower to any Person.

**Sales Commissions.** Commissions paid by Companies to Master Agent or assigned by Borrower to Master Agent for the sale, renewal, service or delivery of a specific Policy through Borrower. Sales Commissions are not normally contingent upon factors such as Master Agent's loss ratio, premium volume, sales volume or special concessions negotiated by the Master Agent. For the purposes of this Agreement, Sales Commissions shall specifically exclude amounts received by the Master Agent for advertising allowances, prizes, override commissions, profit sharing commissions, supplier bonus commissions and other similar payments. However, Sales Commissions shall specifically include amounts paid to Borrower by the Master Agent pursuant to a bonus plan, the terms of which are defined by the Master Agent in its sole discretion and for which the Master Agent makes no representation regarding future payments or Borrower eligibility. Sales Commissions shall also include any consulting fees, advisory fees, placement fees, service fees, renewal fees or any similar payments paid on or related to any Customer Account by any Person.

© 2007 Brooke Credit Corporation all rights reserved

**Subagent.**  A Person who has entered or may enter into a Subagent Agreement with Borrower.

**Subagent Agreement.**  An agreement entered into by and between Borrower and Subagent and approved by Master Agent pursuant to which Subagent is allowed vested ownership rights in Customer Accounts coded to Subagent and Borrower performs certain accounting and processing services for Subagent.

**Trust Agreement.**  Trust Agreement dated February 1, 2000, as such may be amended from time to time, executed by Master Agent and a trustee pursuant to which Master Agent, among other things, transfers control of Sales Commissions to a trustee for such trustee's distribution pursuant to the terms thereof.

## TERMS AND CONDITIONS

This Agreement is subject to the following terms and conditions.

1.      **Promissory Note.**  Borrower shall execute a promissory note (substantially in the form attached hereto as Exhibit A) in the amount of $277,499.25 (the "Note"). The Note shall provide for monthly payments, payable on the fifteenth day of every month, and shall mature 180 months after the date of said Note.  The Note shall also provide for an interest rate that begins at 11.00% and varies each time the New York Prime rate, as published in the Wall Street Journal, changes, plus three and one half percent (3.50%) with such rate effective the business banking day following the publication of such rate in the Wall Street Journal.  (Note: The loan interest rate shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited to the principal of the loan or, if that has been paid, refunded.  This nonusurious interest provision overrides other provisions in this and all other loan documents.)  Although loan interest rates may adjust more frequently for the purposes such as interest accrual and loan amortization, actual loan payments made by borrowers under the interest rate scenario above will adjust the calendar month immediately following the month during which the rate changed.  Payment amounts for periods following origination will be determined by re-amortizing the outstanding principal at the current interest rate, with payment in full at maturity.  All Notes executed by Borrower shall provide for a prepayment premium during the first five (5) years after the date of the first loan payment equal to three and a half percent (3.5%) of the principal balance Borrower prepays.  There shall be no prepayment premium after sixty months following the date of the first payment due under the Note(s).

2.      **Security Agreement.**  Borrower shall execute a security agreement (substantially in the form attached hereto as Exhibit B) and security agreement addendum (substantially in the form attached hereto as Exhibit C) which provides for, among other terms, a purchase money security interest in the acquired Agency Assets.

3.      **Financing Statement.**  Borrower shall execute a UCC-1 financing statement form (substantially in the form attached hereto as Exhibit D) which shall be filed to perfect Lender's security interest in the Agency Assets and such other assets Lender may require.  Borrower authorizes and instructs Lender to file a UCC-1 financing statement form on the Agency Assets, and such other assets as Lender may require, prior to the Lender's extension of credit to Borrower.

4.      **Guaranty.**  Upon Lender's request, Borrower shall provide to Lender a duly executed continuing and unlimited guaranty agreement of Borrower's principals, officers, directors, spouse, or other Person Lender may require or Borrower may offer, substantially in the form attached hereto as Exhibit E (the "Guaranty").   The Guaranty shall unconditionally guaranty the payment and performance of each and every existing and future debt, liability and obligation of Borrower to Lender.

5.      **Opinions of Counsel.**

        a)      Borrower shall provide to Lender, upon Lender's request and substantially in the form attached hereto as Exhibit F, the opinion(s) of Borrower's counsel.

© 2007 Brooke Credit Corporation all rights reserved

b)      Borrower shall also provide to Lender, upon Lender's request, the opinion of Borrower's counsel as to these same or substantially similar points with regard to Borrower's purchase of Agency Assets.

6.      **Affidavit Regarding Financial Status and other Material Facts.**  Borrower shall execute on the Closing Date an affidavit substantially in the form attached hereto as Exhibit G (the Affidavit") which Affidavit shall certify, under penalty of perjury that there have been no material adverse changes in Borrower's financial status or any other circumstances which Lender deems material to its decision to extend credit.

7.      **Authorization to Release Information.**  Borrower hereby authorizes any Person that may have agency, loan, financial, credit, valuation or other confidential or non-confidential information to release to Lender such information as Lender, in its sole discretion, deems necessary to respond to regulatory inquires; for the performance of audits, quality control or other reviews or to market the Loan Documents;  or for any other legitimate purpose. Furthermore, upon Lender's request, Borrower shall sign a release  substantially in the form attached hereto as Exhibit H authorizing the release to Lender of any financial, credit, valuation or other confidential or non-confidential information which Lender, in its sole discretion, deems necessary  to respond to regulatory inquires;  to perform audits, quality control or other reviews, or to market the Loan Documents;  or for any other legitimate purpose.

8.      **Lender's Protection Addendum.**  Borrower and Master Agent shall execute a Lender's Protection Addendum substantially in the form attached hereto as Exhibit I, which shall be made a part of and attached to the Agent Agreement.  The Lender's Protection Addendum sets forth terms and conditions applicable to Borrower and Master Agent and their rights and obligations pertaining to Lender, Lender's security interest and the loan. By executing the Lender's Protection Addendum, among other things, Borrower agrees to and acknowledges the existence of the Collateral Preservation Agreement and certain obligations and duties of Master Agent to Lender set forth therein which may have a material effect on Borrower.

9.      **Settlement or Closing Statement.**  Upon Lender's request, Borrower shall sign a settlement or closing statement  substantially in the form attached hereto as Exhibit J, which pertains to and authorizes the distribution of loan proceeds and  delineates, among other items, certain transaction fees and costs.

10.     **Financial Reports and Additional Documents.**

a)      Borrower will provide to Lender annually and, as soon as is practicable at any other time following Lender's request, any financial statement or financial, credit, valuation, organizational or other such confidential or non-confidential information Lender may deem necessary in its discretion.   Upon Lender's request, Borrower shall confirm and/or certify such statements, valuations or other information.  Upon Lender's request, Borrower shall provide statements, valuations or other information audited by a qualified third party and/or prepared in accordance with generally accepted accounting practices or GAAP standards. In addition, upon Lender's request, Borrower agrees to obtain and provide to Lender any statements, valuations or other information (confidential or non-confidential) Lender may deem necessary in its discretion pertaining to any or all guarantors, and which shall, at Lender's discretion, be certified, audited, and/or prepared in accordance with generally accepted accounting practices or GAAP standards. Borrower authorizes Lender to provide any such information to trustees a party of the Trust Agreement, auditors, regulators, attorneys, consultants, rating agencies, analysts, prospective purchasers of Borrower's loan or other Person needing such information for legitimate purposes.  Borrower holds Lender, its owners, officers, directors, partners, independent contractors and employees harmless from any and all claims, damages or liability resulting from any further and improper disclosure of such information by such third parties.

b)      Borrower agrees to sign, acknowledge, deliver, and file any additional documents, statements or certifications that Lender may consider necessary to carry out the intent of this Agreement;  to perfect, continue and preserve Borrower's obligations under any Loan Document;  to perfect, continue or preserve Lender's lienholder status;  to replace or correct lost, misplaced, incorrectly filed, misstated or incorrect Loan Documents;  to correct or adjust for clerical errors;  to complete incomplete or deficient Loan Documents;  to assure that the executed Loan Documents will conform to and be acceptable in the market

© 2007 Brooke Credit Corporation all rights reserved

place in the instance of transfer, sale or conveyance by Lender of its interest in and to said Loan Documents; to assure that the Loan Documents are in compliance with all laws, rules, regulations or the requirements of any prospective purchaser to whom Lender seeks to market the Loan Documents; to enable Lender to sell, convey, seek guaranty, insure or market the Loan Document to any Person.  Upon Lender's request, Borrower shall execute a limited power of attorney which grants to Lender the power and authority to sign, acknowledge, deliver and file as Borrower's attorney in fact any such additional documents, statements, or certifications.  Any written request for additional documentation made by Lender shall be prima facie evidence of the necessity for same.

11.     **Acknowledgment.**  Upon Lender's request, Borrower shall deliver to Lender on or before the Closing Date, an acknowledgment of a third party in substantially the form attached hereto as Exhibit K.  Pursuant to such acknowledgment, said third party shall swear and attest under penalty of perjury that he/she witnessed Borrower or Borrower's authorized representative sign the Loan Documents described in paragraphs 1 through 10 herein, and that Borrower or Borrower's authorized representative is the signatory whom he/she represents to be.

12.     **Assignment of Agency Assets.**

a)      Borrower grants, conveys and assigns to Lender as additional security all the right, title and interest in and to Borrower's Agency Assets, including without limitation, Borrower's rights, title and interest in and to the Agent Agreement, Subagent Agreements, Agent's Account and Customer Accounts.  Borrower shall defend the rights of Lender in and to Agency Assets against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender and shall keep the Agency Assets free from liens, assignments, and other security interests except for the assignment of security interest granted pursuant to the Loans Documents.

b)      Borrower may collect, receive, enjoy and use the Agency Assets so long as Borrower is not in default under the terms of any of the Loan Documents.  Borrower agrees that the assignment of Agency Assets shall be immediately effective between the parties to this Agreement and that it shall be effective as to third parties when Lender or its agent notifies Borrower of default, Borrower fails to cure such default within the time allowed hereunder, and Lender demands that the Agency Assets be transferred and paid directly to Lender.

c)      Borrower agrees that Lender, without liability to Borrower, may take actual possession of the Agency Assets without the necessity of commencing legal action and that actual possession is deemed to occur when Lender or its agent notifies Borrower of default, Borrower fails to cure such default within the time allowed hereunder, and demands that the Agency Assets be transferred and paid directly to Lender.  Borrower agrees that, upon Borrower's default and failure to cure default within the time allowed hereunder, Lender may, without liability to Borrower, transfer any of the Agency Assets or evidence thereof into its own name or that of its designee and/or demand, collect, convert, redeem, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon its collateral in its own name, its designee's name or in the name of Borrower.

d)      On payment in full of the obligations and all other charges owed by Borrower to Lender under the Loan Documents, Lender shall execute and deliver to Borrower a release of this assignment.

13.     **Default.**

a)      Lender may upon written notice to Borrower, declare Borrower to be in default if:  Borrower fails to fulfill or perform any term, condition or obligation set forth in any Loan Document, including without limitations Borrower's failure to make payments when due in accordance with the terms of the Note; or, if any representation or warranty set forth in any Loan Document is not as represented or warranted by Borrower.

b)      In addition, Lender may upon written notice to Borrower, declare Borrower to be in default upon the occurrence of any of the following events:

© 2002 Brooke Credit Corporation all rights reserved

i.      Borrower's failure to fulfill, perform or enforce any term, condition or obligation set forth in any agreement by Borrower to purchase Agency Assets that are related to or the subject of the Loan Documents;

ii.     Borrower's failure to fulfill, perform or enforce any term, condition or obligation set forth in the Agent Agreement;

iii.    any representation or warranty set forth in the Agent Agreement is not as represented or warranted by Borrower;

iv.     the Agent Agreement is terminated by Borrower or Master Agent;

v.      the total annual Sales Commissions for the most recent calendar year (or the immediately preceding twelve month period if selected by Lender) decrease to forty percent or less of the principal balance of the Note;

vi.     a significant impairment of Lender's prospect of any payment, performance, or ability to realize upon assets in which it has a security interest arises;

vii.    an individual Borrower's insolvency, death or legal incapacitation;  a guarantor's insolvency, death or legal incapacitation;  or, the insolvency, death or legal incapacitation of a principal, officer or owner of Borrower;

viii.   the refusal by any guarantor to guaranty the payment and performance of any future debt, liability and obligation of Borrower to Lender;

ix.     if at any time the total of all outstanding obligations of Borrower (and/or any guarantor of Borrower's obligations, at Lender's sole discretion) to Lender and/or any other Person exceeds one hundred thirty percent (130%) of the original Note amount;

x.      if, without Lender's prior written consent, borrower's ownership interest in agency assets is transferred, diluted or further encumbered in any manner, including but not limited to,  the issuance of new shares, assignment or gift of shares, the substitution of shares, the hypothecation or pledge of shares (Note: Applies at Lender's discretion, if Borrower is a corporation, or if individual Borrower pledges shares of a corporation as collateral);

xi.     if, Borrower does not pay obligations associated with the Agency Assets or the operation of Borrower's agency in a timely manner and Lender, in its sole discretion, determines Borrower's delinquency will materially impair Lender's security interest.

c)      A default by Borrower in performing under the terms of one Loan Document shall constitute a default under the terms of all other Loan Documents.

d)      A default by Borrower in performing the obligations and duties of any contract relating to Borrower's business shall constitute a default under the terms of this Agreement.

(e)     If any material provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or either Lender or any of its subsidiaries shall challenge the enforceability of any Loan Documents or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any security interest created under any Loan Document shall cease to be a valid and perfected first priority security interest or second priority security

© 2007 Brooke Credit Corporation all rights reserved

interest or lien (as the case may be) (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(f)     The occurrence of an event or condition that, in Lender's reasonable judgment, is reasonably likely to result in a material adverse effect on (i) the business, condition (financial or otherwise), operations, properties or prospects of the Borrower taken as a whole that would make it likely that Borrower will not currently or in the future be able to comply with the applicable financial covenants set forth in the Loan Documents, or (ii) the rights and remedies of Lender under any Loan Document.

**14.**     **Remedies Upon and Effect of Default.**  In addition to any remedy or right Lender has under any Loan Document, the Uniform Commercial Code or other law, and in addition to any effect of default set forth in any other Loan Document, the Uniform Commercial Code or other law, in the event Borrower fails to cure any monetary default within five (5) calendar days or any non monetary default within fifteen (15) calendar days:

a)     Borrower shall cooperate fully with Lender or a receiver and promptly endorse, set over, transfer and deliver to Lender or a receiver any Agency Assets in Borrower's possession or held by a third party. Borrower expressly agrees and acknowledges Lender's or a receiver's right to Agency Assets, right to possession of Agency Assets and right to operate Borrower's business without the necessity of commencing legal action and without Borrower's further action or authorization.

b)     Borrower shall deposit any receipts received by Borrower in the Receipts Trust Account described in the Lender's Protection Addendum or in such other deposit account designated by Lender.

c)     For a period of three (3) years after Borrower's default, Borrower and Janice Soto, Individually shall not directly or indirectly solicit or write Policies for any of Borrower's customers and shall not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Master Agent, its successors, assigns or designees. Borrower and Janice Soto, Individually agrees that this prohibition is reasonable and necessary and that the credit extended to Borrower and Janice Soto, Individually is ample consideration for this restriction. Borrower and Janice Soto, Individually understands that Borrower and Janice Soto, Individually is not prohibited from working for any other company or in any particular line of work, but that this covenant not to compete only restricts the Borrower and Janice Soto, Individually from writing insurance for or contacting in person, by telephone, by mail, or by any other means, those customers or potential customers he/she worked with while an agent of Master Agent.

d)     Borrower shall enforce, for the continued benefit of Lender, all non solicitation agreements or non compete agreements currently in force between Borrower and its owners, officers, directors, partners, independent contractors and employees.

e)     Borrower shall cause, Borrower's owners, officers, directors, partners, independent contractors and employees to cooperate with Lender in transferring ownership of all property to Lender.

f)     Lender, without appointing a receiver, shall be entitled, but is not required, to take possession and control of the Agency Assets and collect the rents, issues, and profits thereof. However, Lender shall be entitled, but is not required, to have a receiver appointed by a court of competent jurisdiction to take possession and control of the Agency Assets and collect the rents, issues, and profits thereof. In the event a receiver is appointed, the amount so collected by the receiver shall be applied under the direction of the court to the payment of any judgment rendered or amount found due under the Loan Documents. However, under no circumstances whatsoever shall the appointment of the receiver be considered to create a control of Borrower's business by Lender and at all times the receiver shall be an agent apart from Lender and responsible only to the appointing court.

*C. 2007 Brooke Credit Corporation all rights reserved*

g)      All rights and remedies of Lender under this Agreement and the Loan Documents shall be cumulative, and the exercise of one or more rights or remedies shall not preclude the exercise of any other right or remedy available under this Agreement or applicable law.

Borrower shall be allowed to cure any non monetary default upon written notice from Lender and within the time period stated above in this paragraph 14 unless: (i) such non monetary default has existed for a period of (6) months or more; and/or (ii) Lender reasonably believes that such non monetary default is incurable (Borrower would not be able to cure the non monetary default during the applicable cure period).

15.     **Contingencies; Closing Date.** Lender's extension of credit to Borrower shall be contingent upon: (i) Lender's receipt of all duly executed, original (and recorded as required by Lender) Loan Documents; (ii) Lender's receipt of the duly executed, original Agent Agreement satisfactory to Lender with duly executed, original Lender's Protection Addendum attached thereto; (iii) Lender's satisfaction with the due diligence inspection conducted with respect to Borrower; (iv) Lender's satisfaction with Borrower's interview; (v) Borrower's purchase of Agency Assets and evidence satisfactory to Lender that Borrower has exclusive, good and marketable title to such assets; (vi) if requested by Lender, Lender's receipt of copies of the agreements described in paragraphs 17 and 28 herein; and, (vii) Lender's receipt of duly executed, original Trust Agreement and Collateral Preservation Agreement; (viii) Borrower's compliance with all other terms and conditions set forth in the Loan Documents, Agent Agreement and Lender's Protection Addendum. The Closing Date shall be no later than 60 days from the date hereof, unless otherwise agreed to in writing by the parties. In the event the Closing Date does not occur within 60 days from the date hereof and the parties do not agree upon an extension of the Closing Date, Lender shall have no further duties under any Loan Document and Borrower shall reimburse Lender for any out-of-pocket expenses incurred by Lender in connection with the loan or in preparation for the extension of credit under the Loan Documents.

16.     **Payment of Costs and Fees; Set-off.** Borrower shall pay all costs, expenses (including without limitation Lender's fees, attorney's fees and other professional fees), and taxes incurred by Lender in connection with the negotiation, preparation, execution, delivery and recording of the Loan Documents. In addition, <u>Borrower shall pay immediately upon demand by Lender all fees, costs and expenses (including without limitation attorney's fees and other professional fees) incurred by Lender in connection with the administration or enforcement of the Loan Documents relating to a breach by Borrower of any Loan Documents or otherwise.</u> Any such amount may be added to the principal balance of the loan or offset by Lender from any funds held by Lender or held in trust or by a third party, for Borrower's benefit or otherwise, before or after loan payoff.

17.     **Agreements with Employees, Independent Contractors, Owners, Directors, Officers and Producers.**

a)      Without Lender's prior written consent, Borrower shall not enter into any employment, producer or other agreement which purports to vest or transfer ownership of Agency Assets. Unless otherwise agreed by Lender in writing, Borrower further agrees that all owners, directors, officers, as well as all employees, independent contractors, producers or other such persons having insurance or other financial services licenses or authority, shall enter into written agreements with Borrower containing an acknowledgment of Lender's priority position in Agency Assets, and containing a covenant that such person, for a period of at least three (3) years following termination of such agreement, will not directly or indirectly solicit or write Policies for any of Borrower's customers and will not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Borrower, its successors, assigns or designees. Borrower agrees that it shall enforce such provisions for its benefit and for the benefit of Lender. Borrower agrees to provide to Lender upon Lender's written request: copies of employment, producer or other such agreements pertaining to Borrower's business or operations; and, any employees', independent contractors', owners', directors', officers' and producers' acknowledgment of Lender's priority position in the Agency Assets and other property which are the subject of the Loan Documents or which secure the loan.

b)      Notwithstanding the restrictions set forth in paragraph 17(a), Lender authorizes Borrower to enter into Subagent Agreements so long as same are in compliance with the terms and conditions of the Agent Agreement and same do not provide for the transfer or diversion of Borrower's Agency Assets to such Subagent. Lender acknowledges that pursuant to the Subagent Agreement a Subagent shall have vested

© 2007 Bourke Credit Corporation all rights reserved

ownership rights in Customer Accounts coded to Subagent as indicated on the Agent Account and that Lender's security interest in Customer Accounts owned by Subagent shall be subject to Subagent's vested interest. Lender acknowledges that Borrower does not purport to grant a security interest in the ownership rights Subagent has in Customer Accounts coded to Subagent. Instead, Borrower security interest is limited to Borrower's interest in and relating to Customer Accounts owned by Subagents. Such rights include, without limitation, contract rights and interests of any kind set forth in the Subagent Agreement, rights to payment pursuant to the Subagent Agreement, and rights to any accounts created or described in such Subagent Agreement.

18.     **Consent to Announcement.**  Borrower hereby authorizes Lender, at Lender's own expense, to place announcements or advertisements in financial newspapers, journals, marketing materials or other media containing Borrower's name and/or logo and describing the credit extended by Lender to Borrower, including without limitation the amount of the credit extended.

19.     **Right to Assign or Delegate.**

    a)      Lender may assign or delegate all or any part of its rights, title, interest or obligations in and to this Agreement or under any Loan Document to one or more Persons without the consent of Borrower. Lender may also assign or delegate all or any part of its rights, interest or obligations to service the loan which is the subject of the Loan Documents to one or more Persons without the consent of Borrower.   Any such assignment by Lender shall be without further recourse to Lender.

    b)      Borrower acknowledges that the Loan may, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Agency Assets. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount Loan, and containing terms, provisions and clauses no less favorable to Borrower than those contained in the original Loan Documents, and such other documents and instruments as may be required by Lender to effect the splitting of the Loan.

    c)      Borrower shall not assign or delegate all or any part of its rights, title, interest or obligations under any Loan Document, Agent Agreement or agreement to purchase agency assets without the prior written consent of Lender.

20.     **Indemnification and Hold Harmless.**  Borrower hereby agrees to and acknowledges the existence of the Trust Agreement.   Borrower agrees to defend, indemnify and hold Lender, the trust, trustees under the Trust Agreement, and their owners, officers, directors, partners, employees, and independent contractors thereof (collectively the "indemnified parties") harmless from any and all liability for the distribution of amounts in accordance with the terms and priorities of the Trust Agreement and for incorrect or improper distribution of such amounts except to the extent such incorrect or improper distribution was caused by such indemnified party's willful or gross misconduct.

21.     **Change in Status.**  Borrower agrees to notify Lender immediately upon any change in Borrower's status which may result in the material impairment of Borrower's ability to perform any or all terms of any Loan Documents or which may materially impair Lender's security interest. Such material change in status includes but is not limited to: (i) a significant loss of business, or a loss of a large Customer Account; (ii) a significant change in Borrower's health, financial circumstances, or family status; or (iii) an adverse claim, proceeding, demand or action against Borrower, or Borrower's business. In the event of such change in Borrower's status, Borrower agrees to cooperate fully with Lender to protect Lender's security interest.

22.     **Insurance.**  Borrower agrees to obtain insurance which insures Borrower's person or business, and which is of the type and in the amount which Lender deems necessary to protect its interest.   Borrower agrees to obtain insurance coverage on Borrower's owners, key employees, producers, independent contractors, officers or directors of the types and in the amounts which Lender deems necessary to protect its interest. Any such insurance policies

© 2007 *Rimske Credit Corporation all rights reserved*

shall, at Lender's discretion, name Lender as irrevocable beneficiary or as an additional insured. In addition, Lender may, in its sole discretion, require that it be assigned the cash value of any insurance policy as additional security. As Lenders request, Borrower shall provide evidence of such insurance. In the event no proof of insurance is provided within the specified time, Lender or an affiliated company or designee may, (but is not obligated to) write and place policies to the specifications above and charge the premiums of the policies, plus a placement fee of 10% of the premium, to the Borrower.  Additionally Lender or its affiliates or designee is entitled to retain any commissions or fees generated by the writing of the policy/policies. Borrower may obtain Business Owners' and Workers' Compensation policies independently; however Borrower may not cancel any Brooke placed policies until other policy(ies) is/are in place and shall not be entitled to any refund of premium.

23.      **Agreement to Purchase Agency Assets.**  Borrower shall not amend or waive any material term of any agreement to purchase agency assets without the prior written consent of Lender.  Further, Borrower shall enforce all material terms of such agreement, including but not limited to any agreement or covenant not to solicit or compete, for its benefit and for the benefit of Lender.

24.      **Protection of Property.**  Borrower will use its best efforts to preserve the value of Borrower's Agency Assets and the property in which Lender has a security interest.  Borrower shall not directly or indirectly commit or allow any impairment, deterioration, diversion, or transfer of such property not in the ordinary course of business without Lender's prior written consent.  Borrower will not permit any relocation of the business or any substantial change in the operation of its business without Lender's prior written consent.  Borrower will pay before or as they become due all taxes, assessments, liens, encumbrances, lease payments, and other obligations relating to its business.  If Lender confirms that Sales Commissions have materially declined when compared with the Sales Commissions from prior months or years and Lender believes that such decline indicates a material negative Sales Commissions trend, Lender may require Borrower to enter into an agreement with Master Agent or an affiliate of Master Agent pursuant to which Borrower agrees to conduct specified marketing activities each month and/or enter into an agreement pursuant to which Master Agent or an affiliate of Master Agent analyzes Borrower's agency operations.  Furthermore, in the event the manager of Borrower's business operations dies, becomes disabled, abandons the business operation or experiences other such extenuating circumstances, Lender may require Borrower to retain Master Agent or an affiliate of Master Agent to assist in the management and operation of Franchise Agent's agency until qualified replacement management can be retained or the agency can be sold to another Person. Borrower acknowledges that if any such agreement is required, neither Lender nor Master Agent guarantees the efficacy of such arrangement in preserving or increasing the value of the Agency Assets.  Furthermore, any rights exercised by Lender pursuant to this paragraph shall not be construed as a waiver by Lender of any other rights or remedies it may have pursuant to this Agreement or any other Loan Document.

25.      **Authority to Perform.**  If Borrower fails to perform any duty or any of the covenants contained in any Loan Document, Agent Agreement, a Subagent Agreement or other agreement related to Borrower's business, Lender may without notice perform or cause such duty or covenant to be performed.  Borrower appoints Lender as attorney in fact to sign Borrower's name or pay any amount necessary for performance.  Lender's right to perform for Borrower shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or any Loan Document.  Any amount paid by or incurred by Lender may be added to the principal balance of the loan or offset by Lender from any funds held by Lender or held in trust or by a third party, for Borrower's benefit or otherwise, before or after loan payoff.

26.      **Prior Security Interest.**  With regard to any other security agreement or other lien document purporting to create a prior or subordinate security interest or encumbrance on any Agency Asset, Borrower hereby agrees:  (i) to make all payments when due and to perform or comply with all covenants contained therein; (ii)  to promptly deliver to Lender any notices that Borrower receives from the holder of such security interest;  and (iii) not to allow any modification or extension of nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.  Borrower warrants that it has disclosed in writing any such prior or subordinate security interest to Lender and that nothing in this paragraph is to be interpreted to allow Borrower to grant a prior or subordinate security interest in the Agency Assets without Lender's prior written consent.

© 2007 Brooke Credit Corporation all rights reserved

27.     **Purchase Money Security Interest.** The security interest granted in the Loan Documents secures this loan (including all extensions, renewals, refinancings and modifications thereof) and any other debt Borrower has with Lender now or in the future and, if used to purchase Agency Assets, grants Lender a purchase money security interest. Borrower and Lender agree that the security interest of any future loan or advances by Lender not to purchase additional Agency Assets shall be subordinate to the security on any amounts loaned to Borrower by Lender for the purchase of Agency Assets, now or in the future.

28.     **Allocation of Loan Payments, Prepayments, and Payments on Default to Reduce Debt.** Borrower hereby agrees that Lender may allocate the payments it receives in any manner which Lender deems necessary. This allocation may include but is not limited to current loan amounts, any prepayments, and any past due payments which may otherwise place Borrower in default. This discretion also allows Lender to determine whether to apply the loan payment proceeds to interest or principal. <u>Borrower hereby further agrees that the allocation of the loan payment proceeds is absolutely within the discretion of Lender and therefore waives any objections that Borrower might otherwise express with the allocation amounts.</u>

## REPRESENTATIONS AND WARRANTIES

29.     **Agreement to Purchase Agency Assets.** Borrower represents and warrants that it has provided a true and accurate copy of the agreement to purchase Agency Assets which are related to or the subject of the Loan Documents. Borrower also warrants that such agreement contains a covenant that the seller, for a period of at least three (3) years following closing of such agreement, will not directly or indirectly solicit or write Policies for any of Borrower's customers and will not directly or indirectly attempt to divert any of Borrower's customers from continuing to do business with Borrower, its successors, assigns or designees.

30.     **Other Representations and Warranties.** Borrower warrants and represents to and covenants with Lender that: (a) Borrower has the right, power and capacity and is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and the Loan Documents; (b) the execution, delivery and/or performance by Borrower of this Agreement and the Loan Documents shall not, by the lapse of time, the giving of notice or otherwise, constitute a violation of any applicable law or a breach of any provision contained in Borrower's Articles of Incorporation, Bylaws or similar document, or contained in any agreement, instrument or document to which Borrower is now or hereafter a party or by which it is or may be bound; (c) Borrower is now, and at all times hereafter shall be solvent, and generally paying its debts as they mature and Borrower now owns (or has an interest acceptable to Lender in) and shall at all time hereafter own (or have an interest acceptable to Lender in) property which, at a fair valuation, is greater than the sum of its debts; (d) Borrower is not and will not be, during the term hereof, in violation of any applicable federal, state or local statute, regulation or ordinance that in any respect materially and adversely affects its business, property, assets, operations or condition, financial or otherwise; (e) Borrower is not in default with respect to any indenture, loan agreement, mortgage, deed or other similar agreement relating to the borrowing of monies to which it is a party or by which it is bound; (f) since the date of Borrower's credit application, there has been no material adverse change in the financial condition or other circumstances of Borrower and no change to the financial or other information provided to Lender pursuant to this Agreement; and, (g) Borrower has obtained all federal, state and local licenses necessary to conduct its business as contemplated by the Loan Documents.

## MISCELLANEOUS TERMS AND CONDITIONS

31.     **Amendments.** This agreement may not be modified, revised, altered, added to, or extended in any manner, or superseded other than by an instrument in writing signed by all the parties hereto. No waiver of any provision hereof shall be effective unless agreed to in writing by all parties hereto. Any modification or waiver shall only be effective for the specific instance and for the specific purpose for which given. Borrower agrees and acknowledges that Lender may also be required to obtain the approval of other persons or entities before entering into an amendment or granting a waiver.

© 2007 Brooke Credit Corporation all rights reserved

32.     **Failure to Enforce, Not Waiver.** The failure by Lender to enforce any provision of this Agreement shall not be in any way construed as a waiver of any such provision nor prevent Lender thereafter from enforcing each and every other provision of this Agreement.

33.     **Execution in Duplicate.** The Agreement may be executed in duplicate, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument which shall represent the agreement of the parties hereto.

34.     **Invalidity or Non-enforceability.** The invalidity or non-enforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

35.     **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, administrators, successors, assigns and legal representatives but the rights and property interest hereunder shall not be assignable by any party except as set forth herein. The use of the masculine shall include the feminine, and the use of the singular shall include the plural.

36.     **Survival.** This Agreement shall create and constitute the continuing obligation of the parties hereto in accordance with its terms, and shall remain in full force and effect until the loan is paid in full. The indemnification and hold harmless provisions and the provisions of paragraph 7 hereof shall be continuing and shall survive any termination of this Agreement.

37.     **Integration.**  <u>This Agreement (including all exhibits and addenda hereto) together with the other Loan Documents contains the entire agreement between the parties hereto and shall supersede and take precedence over any and all prior agreements, arrangements or understandings between the parties relating to the subject matter hereof.  No oral understandings; oral statements, oral promises or oral inducements exist.  No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth herein, have been made by the parties hereto. By signing below, Borrower and Lender affirm that no oral agreement between them exists.</u>

38.     **Interpretation.** Provisions in the Loan Documents are intended to be cumulative. To the extent that the provisions of this Agreement conflict with those of any other Loan Document, the provision which provides Lender most protection and grants Lender the greatest rights shall control.   Likewise, if the provisions of any Loan Document conflict with those of any other Loan Document, the provision which provides Lender most protection and grants Lender the greatest rights shall control.

39.     **Governing Law.** Notwithstanding any other provision of this Agreement or any other Loan Document, the Agreement and all Loan Documents shall be construed and governed by the laws of the State of Kansas except to the extent that the perfection of the interests in the Agency Assets is governed by the laws of a jurisdiction other than the State of Kansas. Subject to the arbitration provision set forth below, at the option of Lender, jurisdiction and venue for any dispute arising under or in relation to this Agreement will lie only in Kansas with the Phillips County District Court, Phillipsburg, Kansas, or the U.S. District Court having jurisdiction over Phillips County Kansas. In the event that an arbitration action, lawsuit, administrative proceeding or litigation is brought with respect to this Agreement, the prevailing party shall be entitled to be reimbursed for, and/or have judgment entered with respect to, all of its costs and expenses, including reasonable attorney's fees' and legal expenses.

40.     **Waiver of Jury Trial.**  <u>Borrower hereby expressly waives any right to a trial by jury in any action or proceeding to enforce or defend any rights under this Agreement, any other Loan Document, instrument or document delivered or which may in the future be delivered in connection herewith.  Borrower agrees that any such action or proceeding shall be tried before a court and not a jury.</u>

41.     **Waiver of Marshaling of Assets.** Borrower waives any and all rights to require any marshaling of Borrower's assets.

C. 2007 Brooke Credit Corporation all rights reserved

42.    **Commercial Loan.** Borrower and Lender agree that the credit extended hereunder represents a commercial loan and is not a consumer loan subject to the UCCC.

43.    **Notices.** Notices which may be required to be sent by Lender or Borrower in accordance with this Agreement shall be sent to the address set forth below or such other address as may be designated by such party provided notice of such change in address has been given to the other party. Notices shall be deemed effective if in writing, and delivered by hand or mailed by United States Mail, postage prepaid, mailed by certified mail, with return receipt requested, or mailed by express courier with date of receipt confirmed. The effective date of notice shall be the day of delivery by hand; if mailed by regular mail, four business days following the mailing thereof; and, if by certified mail or express courier, the date of receipt thereof:

Lender's Address:                                      Borrower's Address:

Brooke Credit Corporation                             Attn: Janice Soto
10950 Grandview Drive., Ste 600                       4312 Montana
Overland Park, KS  66210                              El Paso, TX 79903

44.    **Timeliness.** Timeliness and punctuality are essential elements of this Agreement.

45.    **Arbitration.** At the option of Lender, any issue, claim, dispute or controversy that may arise out of, in connection with or relating to the Loan Documents or their breach, and which the parties are not able to resolve themselves, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in a court having jurisdiction thereof. The parties agree to use arbitration to resolve any such issue, claim, dispute or controversy prior to and in lieu of filing any lawsuits, complaints, charges or claims.

46.    **Anti-Terrorism, etc.** Borrower represents and warrants that neither the Borrower, nor any owner, affiliate, partner, director, officer or manager of Borrower, nor any affiliate, parent, child or spouse of any individual Borrower (collectively for this paragraph "Borrower") supports terrorism, provides money or financial services to terrorists, or is engaged in terrorism, is on the current U.S. government list of organizations that support terrorism, nor has engaged in or been convicted of fraud, corruption, bribery, money laundering, narcotics trafficking or other crimes, and all are eligible under applicable U.S. immigration laws to be in the United States and perform the obligations set forth in this Agreement. Borrower further warrants and represents that Borrower is not identified by a government or legal authority as a person with whom Lender is prohibited from transacting business and that it will notify Lender in writing immediately of the occurrence of any event that renders the foregoing representation and warranties incorrect.

47.    **No Duty.** All attorneys, accountants, appraisers, and other professional Persons and consultants retained by the Lender shall have the right to act exclusively in the interest of the Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to any Borrower's shareholders or any other Person.

48.    **Confidentiality.** Borrower agrees that the contents of this Agreement are proprietary and that Borrower will keep the terms and conditions of this Agreement and the negotiations and discussions leading up to this Agreement confidential except to the extent the Borrower needs to divulge such information to their accountants, attorneys, or other professionals as long as such professionals are required to maintain confidentiality.

[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

© 2007 Brooke Credit Corporation all rights reserved

The undersigned agree to the foregoing and acknowledge receipt of a copy of this Agreement on this the 30th day of November, 2007.

Lender:                                                    Borrower:

by: _Anna Beth Marintzer_                                 by: _Janice Soto_
Anna Beth Marintzer                                        Janice Soto, Individually
title:  Loan Officer

## AGREEMENT NOT TO SOLICIT

The undersigned individuals agree to and are bound by the covenants set forth in paragraph 14(C) herein and specifically acknowledge that the covenants contained in said paragraph are reasonable and necessary and that the undersigned has received ample consideration for same.

_Janice Soto_
Janice Soto, Individually

© 2007 Brooke Credit Corporation all rights reserved

## SURRENDER OF COLLATERAL,
## CONSENT TO STRICT FORECLOSURE, RELEASE AND ACKNOWLEDGEMENT
## AGREEMENT

THIS SURRENDER OF COLLATERAL, CONSENT TO STRICT FORECLOSURE, RELEASE AND ACKNOWLEDGEMENT AGREEMENT (this "*Agreement*") is entered into as of October 3 9 2008 among BROOKE CREDIT FUNDING, LLC, a Delaware limited liability company (the "*Debtor*"), ALERITAS CAPITAL CORP., a Delaware corporation (formerly known as Brooke Credit Corporation) ("*Aleritas*"), AUTOBAHN FUNDING COMPANY LLC, a Delaware limited liability company (the "*Lender*"), and DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK (the "*Agent*").

### PRELIMINARY STATEMENTS

A.      Reference is made to the Amended and Restated Credit and Security Agreement dated as of August 29, 2006 among the Borrower, Aleritas, Brooke Corporation, the Lender and the Agent (as amended or otherwise modified prior to the date hereof, the "*Credit Agreement*"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

B.      As security for the performance of the Debtor's obligations under the Credit Agreement, the Debtor granted Agent a first priority security interest in the "Collateral" under and as defined in the Credit Agreement.

C.      The Collateral includes the Loans identified on <u>Annex 1</u> attached hereto, together with all monies due thereunder, and proceeds and recoveries received with respect thereto, and the related loan agreements, promissory notes, guaranties, customer files, and the security interests in the collateral, if any, securing such loans, and the proceeds of any and all of the foregoing (collectively, the "*Specified Loans*") .

D.      Events of Default under the Credit Agreement have occurred and are continuing, and the Agent may exercise all of its rights and remedies in connection therewith including taking possession of and liquidating the Specified Loans, all of the Debtor's rights under the Sale and Servicing Agreement and other Related Documents and the other Collateral.

E.      The Agent has demanded that the Debtor pay all moneys due and payable from the Debtor to the Agent and the Lender under the Credit Agreement.

F.      The Debtor (i) has agreed to turn over and surrender the Specified Loans, all of the Debtor's rights under the Sale and Servicing Agreement and the other Related Documents and all other Collateral (collectively, the "*Surrendered Collateral*") and (ii) agrees that the Agent may retain the Surrendered Collateral in <u>partial</u> satisfaction of the Debtor's obligations under the Credit Agreement.

NOW, THEREFORE, based upon the agreed upon facts set forth above, which are incorporated herein, and the mutual promises contained herein, the parties agree as follows:

NY1 6761784v.11

EXHIBIT

2

1.    ACKNOWLEDGMENTS OF THE DEBTOR AND ALERITAS.

1.1    Each of the Debtor and Aleritas acknowledges that the Debtor is in default under the Credit Agreement and that Events of Default have occurred and are continuing, and that the Debtor is indebted to the Agent and the Lender for the current outstanding principal balance of the Advances, together with the accrued Interest and Facility Fees as of the date hereof, in aggregate amount equal to $34,956,955.86 (the "*Current Debtor Loan Indebtedness*").

1.2    Each of the Debtor and Aleritas acknowledges that: (i) the Agent has been granted a first priority security interest in the in the Collateral, and (ii) the Agent is entitled to proceed immediately to foreclose upon the Collateral and to exercise each of the Agent's other rights and remedies set forth in the Credit Agreement as provided by the New York Uniform Commercial Code and New York law, which governs the Credit Agreement.

1.3    Each of the Debtor and Aleritas irrevocably:

1.3.1    consents to Agent's acceptance of the Surrendered Collateral in partial satisfaction of the obligations of the Debtor to the Agent and the Lender under the Credit Agreement as provided in Section 2.3 of this Agreement; and

1.3.2    irrevocably waives and renounces any and all rights to notice they have or may have under Section 9-601, *et seq.*, of the UCC, Part 6 of the New York Commercial Code including, without limitation, all rights under Section 9-620 to receive notice of the proposed retention of the Surrendered Collateral or subsequent disposition of same, or to the full extent of the law, any other notice or right they may have arising under or pursuant to this or any other section of the New York Uniform Commercial Code or otherwise.

1.4    Each of the Debtor and Aleritas acknowledges that none of them has any claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whether known or unknown, and whenever or howsoever arising (collectively referred to herein as "*Existing Claims*"), that can be asserted to reduce or eliminate any liability to repay any Indebtedness to the Agent or the Debtor or to seek any affirmative relief or damages of any kind or nature from the Agent or the Lender, their respective officers, representatives, employees, counsel, assigns or successors.  To the extent any such Existing Claims exist, they are fully, forever, and irrevocably waived and released by the Debtor and Aleritas as more fully provided for in Section 4 of this Agreement.

2.    LENDER'S ACCEPTANCE OF SURRENDERED COLLATERAL IN PARTIAL SATISFACTION OF INDEBTEDNESS.

2.1    Pursuant to Section 9-620 of the New York Uniform Commercial Code, this document shall constitute notice by the Agent and the Lender and receipt and consent by each of the Debtor and Aleritas of the Agent's proposal to retain the Surrendered Collateral in partial satisfaction of the Indebtedness.  This Agreement shall also constitute the Debtor's and Aleritas's post-default waiver and renunciation of all of their rights under Article 9, subdivision 6, of the New York Uniform Commercial Code (including, without limitation, Section 9-620).

NYI 6761784v.11

2.2     The Agent agrees to accept the Surrendered Collateral in partial satisfaction of the obligations constituting the Indebtedness of the Debtor to the Agent and the Lender under the Credit Agreement, and the amount of such obligations satisfied by the acceptance by the Agent of the Surrendered Collateral shall be equal to an aggregate amount of $22,000,000.00 representing: (x) $920,834.00 of accrued and owing Facility Fees, (y) $20,801,391.00 of outstanding principal balance of Advances (the "*Satisfied Principal Advances Amount*"), and (z) $277,775.00 of interest accrued to the date hereof in respect of the aggregate outstanding principal of all Advances (including, without limitation, the Satisfied Principal Advances Amount) (such amounts referred to in clauses (x), (y) and (z), collectively, the "*Satisfied Loan Indebtedness*"). Each of the Debtor and Aleritas acknowledges and agrees that, after giving effect to such partial satisfaction, the following obligations of the Debtor shall remain outstanding and in full force and effect under the Credit Agreement until paid in full (collectively, the "*Remaining Debtor Obligations*"):  (i) $12,251,032.35 of outstanding principal amount of Advances, plus all interest accruing thereon on and after the date hereof as provided in the Credit Agreement, (ii) all obligations of the Debtor to reimburse the Agent and the Lender for all of Agent's and the Lender's costs, fees and expenses (including attorneys' fees and expenses) incurred in enforcing their rights under the Credit Agreement and Related Documents and (iii) the obligations of the Debtor to pay all other Indemnified Amounts, in each case, whether incurred or arising before, on or after the date of this Agreement.

2.3     Each of the Debtor and Aleritas acknowledges that the credit being received for the Surrendered Collateral is fair and reasonable.

2.4     Each of the Debtor and Aleritas shall assemble and make available to Agent for its immediate possession the Surrendered Collateral and all items relating thereto in possession of the Debtor or Aleritas, as the case may be, including, but not limited to, computer disks, records as to the Surrendered Collateral, contracts, books and records and other information that may reasonably be deemed of assistance to Agent in its management and liquidation of the Surrendered Collateral.

**3.     THE SPECIFIED INELIGIBLE REPURCHASE AMOUNT; CERTAIN ADDITIONAL ACKNOWLEDGEMENTS BY ALERITAS**

3.1     The Agent and the Lender agree to reduce the Specified Ineligible Repurchase Amount from $24,600,000 to $20,000,000 effective as of the date hereof.  Aleritas hereby affirms and ratifies its obligations under the Credit Agreement and the other Related Documents in respect of the Specified Ineligible Repurchase Amount in the amount of $20,000,000.

3.2     Aleritas acknowledges and agrees that  all obligations and liabilities Aleritas has under the Credit Agreement or any of the other Related Documents (including, without limitation, all indemnities) remain in full force and effect and shall not be satisfied in any way by the acceptance of the Surrendered Collateral by the Agent in partial satisfaction of the Debtor's obligations as provided in this Agreement.

NY1 6761784v.11

4.   **RELEASE OF CLAIMS.**

4.1   Each of the Debtor and Aleritas, on behalf of each of their respective successors, assigns, heirs and estates, hereby forever and irrevocably release the Agent and the Lender and their respective affiliates, members, managers, representatives, agents, attorneys, employees, predecessors, successors and assigns from any and all claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whenever or howsoever arising, including, but not limited to, the Existing Claims (collectively, the "*Released Claims*"), whether such Released Claims are known or unknown, contingent or absolute, existing as of the date of this Agreement. The Released Claims include, without limitation, all claims:

4.1.1   that the Agent or the Lender breached its obligations under the Credit Agreement; and

4.1.2   of tort or wrongful conduct, including, but not limited to, any claim by the Debtor or Aleritas for trade libel and/or any claim of fraudulent representation or concealment, or claim of misappropriation against the Agent or the Lender or their respective affiliates, members, representatives, agents, attorneys, employees, predecessors, successors and assigns.

5.   **BANKRUPTCY MATTERS.**

5.1   THE DEBTOR AND ALERITAS EACH ACKNOWLEDGE THAT:

5.1.1   IF THE DEBTOR OR ALERITAS, OR ANY OF THEM, FAIL TO PERFORM THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT OR THE CREDIT AGREEMENT OR ANY RELATED DOCUMENT AND FILE, OR HAVE FILED AGAINST THEM, A CASE UNDER THE BANKRUPTCY CODE, SUCH A FILING COULD DELAY THE LENDER'S DISPOSITION OF THE SURRENDERED COLLATERAL. IN THAT EVENT, THE AGENT AND THE LENDER HAVE GOOD CAUSE FOR OBTAINING RELIEF FROM THE AUTOMATIC STAY IMPOSED BY SECTION 362 OF TITLE 11 OF THE BANKRUPTCY CODE OR ANY SIMILAR PROVISION OF LAW INCLUDING ANY RIGHT TO SEEK RELIEF UNDER SECTION 105 OF THE BANKRUPTCY CODE;

5.1.2   THE SURRENDERED COLLATERAL IS NOT NECESSARY TO AN EFFECTIVE REORGANIZATION OF THE DEBTOR BECAUSE AN EFFECTIVE REORGANIZATION IS NOT POSSIBLE; AND

5.1.3   THE DEBTOR AND ALERITAS CANNOT PROVIDE "ADEQUATE PROTECTION" (AS DEFINED IN SECTION 362(D)(1) OF THE CODE) OF AGENT'S SECURITY INTEREST IN THE SURRENDERED COLLATERAL.

5.2   THE DEBTOR AND ALERITAS MAKE THE FOREGOING ACKNOWLEDGMENTS WITH THE UNDERSTANDING AND DESIRE THAT THEY BE TREATED AS ADMISSIONS IN CONNECTION WITH ANY PROCEEDING FOR RELIEF FROM THE AUTOMATIC STAY OR ANY SIMILAR PROVISION OF LAW WHEREIN THE AGENT IS SEEKING LEAVE TO FORECLOSE OR EXERCISE ANY REMEDY

4

AGAINST THE SURRENDERED COLLATERAL IN ANY SUBSEQUENT BANKRUPTCY
PROCEEDING THAT INVOLVES THE DEBTOR.

5.3     BASED ON THE FOREGOING FACTUAL BACKGROUND, THE DEBTOR
AND ALERITAS AGREE THAT, IN THE EVENT THAT ANY ONE OR MORE OF THEM
SHALL (I) FILE OR SEEK IN ANY FUTURE CHAPTER 11 CASE (OR ANY OTHER CASE
FILED UNDER THE BANKRUPTCY CODE BY OR AGAINST EITHER THE DEBTOR)
ANY RELIEF TO MODIFY OR LIMIT THE AGENT'S OR THE LENDER'S RIGHTS
HEREUNDER IN ANY BANKRUPTCY COURT OF COMPETENT JURISDICTION OR, (ii)
HAVE SOUGHT OR CONSENTED TO OR ACQUIESCED IN THE APPOINTMENT OF
ANY TRUSTEE, RECEIVER, CONSERVATOR OR LIQUIDATOR, (iii) BE THE SUBJECT
OF ANY ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF
COMPETENT JURISDICTION APPROVING A PETITION FILED BY OR AGAINST SUCH
PARTY FOR ANY REORGANIZATION, ARRANGEMENT, COMPOSITION,
READJUSTMENT, LIQUIDATION, DISSOLUTION OR SIMILAR RELIEF UNDER ANY
PRESENT OR FUTURE FEDERAL OR STATE LAW RELATING TO BANKRUPTCY,
INSOLVENCY OR RELIEF FOR THE DEBTOR, THEN THE AGENT SHALL THEREUPON
BE ENTITLED TO RELIEF FROM:

5.3.1   ANY AUTOMATIC STAY IMPOSED BY SECTION 362 OF TITLE 11
OF THE BANKRUPTCY CODE, AS AMENDED, ON OR AGAINST THE RIGHTS AND
REMEDIES OTHERWISE AVAILABLE TO AGENT OR THE LENDER AS PROVIDED IN
THIS AGREEMENT OR IN THE CREDIT AGREEMENT, OR

5.3.2   ANY OTHER SIMILAR PROVISION OF LAW WHICH RESULTS IN
A DELAY OR A PROHIBITION OF THE AGENT'S OR THE LENDER'S RIGHT TO
EXERCISE ITS RIGHTS AND REMEDIES UNDER THIS AGREEMENT AND THE
CREDIT AGREEMENT.

5.3.3   THE DEBTOR AND ALERITAS HEREBY FURTHER AGREE:

(i)     TO TAKE AND/OR CONSENT TO ANY AND ALL ACTION
NECESSARY TO EFFECTUATE SUCH RELIEF FROM THE AUTOMATIC STAY
OR OTHER PROVISION OF LAW, AND

(ii)    THAT THEY WAIVE THEIR RIGHTS TO SEEK SECTION 105
INJUNCTIONS, ANY OTHER CLAIMS, AND THE FILING OF A SUBSEQUENT
PROCEEDING BY EITHER THE DEBTOR OR ALERITAS WITH RESPECT TO
ANY ACTS BY THE AGENT OR THE LENDER TO ENFORCE RIGHTS IN THE
SURRENDERED COLLATERAL.

5.4     PROVIDED THE DEBTOR OR ALERITAS IS VIGOROUSLY OPPOSING
THE RELIEF SOUGHT, THE FOREGOING CONSENT AND WAIVER SHALL NOT
APPLY TO AN INVOLUNTARY PETITION FILED AGAINST THE DEBTOR UNTIL AND
UNLESS A FINAL ORDER FOR RELIEF IS ENTERED; PROVIDED, HOWEVER, THAT
NOTHING SET FORTH HEREIN SHALL PREVENT  THE AGENT OR THE LENDER

NYI 6761784v.11

FROM SEEKING RELIEF FROM THE AUTOMATIC STAY OR ANY OTHER RELIEF IT DESIRES.

6.   MISCELLANEOUS.

6.1   <u>Governing Law; Jury Waiver.</u>

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK BUT OTHERWISE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

EACH OF THE PARTIES HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

6.2   <u>Consent to Jurisdiction.</u> EACH OF THE PARTIES TO THIS AGREEMENT HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY OR, TO THE EXTENT SUCH COURT LACKS JURISDICTION, THE COURTS OF THE STATE OF NEW YORK, AND EACH WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY REGISTERED MAIL, AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U.S. MAILS, POSTAGE PREPAID. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ANY OBJECTION BASED ON <u>FORUM NON CONVENIENS</u> AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION 6.3 SHALL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT ANY PARTY'S RIGHT TO BRING ANY ACTION OR PROCEEDING IN THE COURTS OF ANY OTHER JURISDICTION.

6.3   <u>Execution in Counterparts.</u> This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

6.4   <u>Severability; Integration; No Oral Modifications.</u> In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such

6

NYI 6761784v.11

provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than the other Related Documents to which the Agent is a party. Each of the parties understands that in the event of any subsequent litigation, controversy or dispute concerning any terms, conditions or provisions of this Agreement, neither party shall be permitted to offer or introduce any oral evidence concerning any other oral promises or oral promises or oral agreements between the parties relating to the subject matters of this Agreement not included or referred to herein and not reflected by a writing.  This Agreement cannot be amended, modified, or supplemented except by a written document signed by all parties hereto.

     6.5    <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

[SIGNATURES FOLLOW ON NEXT PAGE]

NYI 6761784v.11

7

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BROOKE CREDIT FUNDING, LLC

By _____
Name:   Anita Larson
Title:    Vice President


ALERITAS CAPITAL CORP.

By _____
Name:   Silverman Consulting
Title:    Chief Restructuring Officer
By:       Stephen Theobald

*Signature Page to*
*Surrender of Collateral, Consent to Strict Foreclosure,*
*Release and Acknowledgment Agreement*

NY1 6761784v.11

DZ BANK AG DEUTSCHE
ZENTRAL-GENOSSENSCHAFTSBANK, as
Agent

By _____
Name   **Patrick F. Preece**
Title   Senior Vice President

By _____
Name   Cecil Smart Jr.
Title   Assistant Vice President

AUTOBAHN FUNDING COMPANY LLC, as
Lender

By: DZ BANK AG DEUTSCHE
ZENTRAL-GENOSSENSCHAFTSBANK, its
Attorney-in-Fact

By _____
Name   **Patrick F. Preece**
Title   Senior Vice President

By _____
Name   Cecil Smart Jr.
Title   Assistant Vice President

*Signature Page to*
*Surrender of Collateral, Consent to Strict Foreclosure,*
*Release and Acknowledgment Agreement*

NY1 6761784v.11

<u>OMNIBUS ASSIGNMENT</u>

Dated: October 31, 2008

Reference is made to the Amended and Restated Sale and Servicing Agreement dated as of August 29, 2006 (as heretofore amended, the "<u>Sale and Servicing Agreement</u>"), among Textron Business Services, Inc., Aleritas Capital Corp. (formerly known as Brooke Credit Corporation) and Brooke Credit Funding, LLC (the "<u>Issuer</u>"). Capitalized terms used but not defined herein are used as defined in the Sale and Servicing Agreement.

The undersigned herby sells, assigns and otherwise conveys to DZ Bank AG Deutsche Zentral-Genossenschaftsbank ("<u>DZ Bank</u>") all right, title and interest of the undersigned in and to: (i) the loans listed in Annex A attached hereto (each a "Loan"), all monies due thereunder and all Liquidation Proceeds and recoveries received with respect to such Loans; (ii) the security interests in the collateral, if any, securing the Loans granted by Obligors pursuant to the Loans; (iii) the Loan File related to each Loan; and (iv) the proceeds of any and all of the foregoing. The foregoing sale does not constitute and is not intended to result in any assumption by DZ Bank of any obligation of the undersigned to the Obligors, insurers or any other Person in connection with the Loans, the Loan Files, any insurance policies or any agreement or instrument relating to any of them.

This Omnibus Assignment shall be governed by and construed in accordance with the internal laws of the State of New York.

[signature page follows]

NY1 6784840v.1

EXHIBIT

3

IN WITNESS WHEREOF, the undersigned has caused this Assignment to be duly executed as of the date first written above.

BROOKE CREDIT FUNDING, LLC

By: _____
    Name:   Anita Larson
    Title:    Vice President